IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:19-CV-139-FL

DAVID E. COLBURN,                                      )
                                                       )
                        Plaintiff,                     )
        v.                                             )
                                                       )
HICKORY SPRINGS                                        )
MANUFACTURING COMPANY,                                 )
HICKORY SPRINGS                                        )
MANUFACTURING COMPANY                                  )
SUPPLEMENTAL EXECUTIVE                                 )
RETIREMENT PLAN, THE                                   )
COMPENSATION COMMITTEE OF THE                          )
BOARD OF DIRECTORS OF HICKORY                          )
SPRINGS MANUFACTURING                                  )
COMPANY, as Administrator of the                       )
Supplemental Executive Retirement Plan,                )
DAVID F. UNDERDOWN, individually                       )
and as a member of the Compensation                    )
Committee of the Board of Directors of                 )
Hickory Springs Manufacturing Company,                 )
J. DAVID CARTWRIGHT, individually                      )
and as a member of the Compensation                    )
Committee of the Board of Directors of                 )
Hickory Springs Manufacturing Company,                 )
DARRELL BRYANT, individually and as a                  )
Member of the Compensation Committee of                )
the Board of Directors of Hickory Springs              )
Manufacturing Company, BOBBY BUSH,                     )
individually and as a member of the                    )
Compensation Committee of the Board of                 )
Directors of Hickory Springs Manufacturing             )
Company, MARK JONES, individually and                  )
as a member of the Compensation                        )
Committee of the Board of Directors of                 )
Hickory Springs Manufacturing Company,                 )
ROBERT SIMMONS, individually and as a                  )
member of the Compensation Committee of                )
the Board of Directors of Hickory Springs              )
Manufacturing Company,                                 )

|                                                              |     |
| ------------------------------------------------------------ | --- |
|         Defendants.   | )   |

Defendants.                                                    )
                                                               )
                                                               )
HICKORY SPRINGS                                                )
MANUFACTURING COMPANY,                                         )
HICKORY SPRINGS                                                )
MANUFACTURING COMPANY                                          )
SUPPLEMENTAL EXECUTIVE                                         )
RETIREMENT PLAN, THE                                           )
COMPENSATION COMMITTEE OF THE                                  )
BOARD OF DIRECTORS OF HICKORY                                  )
SPRINGS MANUFACTURING                                          )
COMPANY, as Administrator of the                               )
Supplemental Executive Retirement Plan,                        )
DAVID F. UNDERDOWN, individually                               )
and as a member of the Compensation                            )
Committee of the Board of Directors of                         )
Hickory Springs Manufacturing Company,                         )
J. DAVID CARTWRIGHT, individually                              )
and as a member of the Compensation                            )
Committee of the Board of Directors of                         )
Hickory Springs Manufacturing Company,                         )
DARRELL BRYANT, individually and as a                          )
, of the Compensation Committee of the                         )
Board of Directors of Hickory Springs                          )
Manufacturing Company, BOBBY BUSH,                             )
individually and as a member of the                            )
Compensation Committee of the Board of                         )
Directors of Hickory Springs Manufacturing                     )
Company, MARK JONES, individually and                          )
as a member of the Compensation                                )
Committee of the Board of Directors of                         )
Hickory Springs Manufacturing Company,                         )
ROBERT SIMMONS, individually and as a                          )
member of the Compensation Committee of                        )
the Board of Directors of Hickory Springs                      )
Manufacturing Company,                                         )
                                                               )
        Counter Claimants,   )
    v.                                      )
                                                               )
DAVID E. COLBURN,                                              )
                                                               )
        Counter Defendant.   )
                                                               )
                                                               )
                                                               )

2

DAVID E. COLBURN,                                    )
                                                     )
                      Cross-Claimant,                )
                                                     )
      v.                                             )
                                                     )
DAVID F. UNDERDOWN, individually                     )
and as a member of the Compensation                  )
Committee of the Board of Directors of               )
Hickory Springs Manufacturing Company,               )
J. DAVID CARTWRIGHT, individually                    )
and as a member of the Compensation                  )
Committee of the Board of Directors of               )
Hickory Springs Manufacturing Company,               )
ROBERT SIMMONS, individually and as a                )
member of the Compensation Committee of              )
the Board of Directors of Hickory Springs            )
Manufacturing Company,                               )
                                                     )
                      Cross-Defendants.              )

 

This matter is before the court on plaintiff's motion to dismiss counterclaims (DE 24), defendants' motion for partial summary judgment (DE 35), and plaintiff's motion for judgment on the pleadings (DE 37). The issues raised have been briefed fully, and in this posture, are ripe for ruling. For the following reasons, the court grants plaintiff's motion to dismiss counterclaims (DE 24), grants defendants' motion for partial summary judgment (DE 35), and denies plaintiff's motion for judgment on the pleadings (DE 37).

## STATEMENT OF THE CASE

Plaintiff initiated this action April 9, 2019, and filed the operative amended complaint May 2, 2019, under the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001 et seq., seeking recovery of retirement benefits under a 2012 Supplemental Executive Retirement Plan ("2012 SERP"). Plaintiff alleges improper denial of benefits in violation of ERISA § 502(a)(1); breach of fiduciary duty in violation of ERISA §§ 404(a)(1)(A),

(B), and (D); prohibited transaction in violation of ERISA §§ 406(a)(1)(A) and (D); and adverse actions in violation of ERISA § 510. Plaintiff also brings a claim for unpaid wages under the North Carolina Wage and Hour Act ("NCWHA") against defendant Hickory Springs Manufacturing Company ("HSM").

On June 21, 2019, defendants Mark Jones, Darrell Bryant ("Bryant"), Robert Simmons ("Simmons"), HSM, J. David Cartwright ("Cartwright"), HSM SERP, the compensation committee of the board of directors of HSM ("compensation committee"), Bobby Bush, and David F. Underdown ("Underdown") (collectively "defendants") filed answer, and defendant HSM asserted counterclaims against plaintiff for rescission and constructive fraud. Defendants subsequently filed motion to transfer the instant action to the Western District of North Carolina.

On July 29, 2019, the parties filed joint report and plan, wherein they stated that an early determination by the court as to whether the 2012 SERP constitutes a "top hat" plan would significantly reduce the complexity of the case. Thereafter, the court entered text order, inviting the parties to submit briefing on the issue of "top hat" status and defendants' motion to transfer venue. The court delayed entry of its case management order, pending completion of briefing on the above issues and decisions thereon by the court.[1]

On August 12, 2019, plaintiff answered defendant HSM's counterclaims, asserted a crossclaim for contribution against defendants Underdown, Cartwright, and Simmons, and asserted a claim for indemnification against defendant HSM. That same day, plaintiff filed the instant motion to dismiss defendant HSM's counterclaims, asserting that ERISA preempted the counterclaims, and alternatively, that neither counterclaim states a cause of action under North Carolina law. Defendant HSM responded in opposition and plaintiff replied. After plaintiff moved

---

[1] On September 13, 2019, the court denied defendants' motion to transfer venue.

to dismiss defendant HSM's counterclaims, defendants filed motion to amend their answer, which the court granted September 12, 2019.[2]

On September 13, 2019, plaintiff and defendants filed the instant motions, respectively, on the issue of whether the 2012 SERP constitutes a "top hat" plan. Specifically, plaintiff moves for judgment on the pleadings, arguing that the 2012 SERP does not qualify as a "top hat" plan and is therefore subject to ERISA's fiduciary requirements. Defendants responded in opposition, and plaintiff replied. At the same time, defendants move for partial summary judgment, arguing that the 2012 SERP qualifies as a "top hat" plan and is therefore exempt from the fiduciary requirements that plaintiff's second and third claims for relief are based upon. Defendants also argue that ERISA preempts plaintiff's NCWHA claim for unpaid wages.

In support of their motion, defendants rely on statement of material facts, memorandum of law, and the following exhibits: 1) affidavit of defendant Underdown (attaching exhibits including trust agreement, correspondence, defendant compensation committee minutes, and top hat plan statement), 2) affidavit of defendant Bryant, 3) Internal Revenue Service cost of living adjustments, 4) United States Department of Labor ("DOL") Opinion Letter, 5) DOL Amicus Brief, and 6) plaintiff's amended complaint. Responding in opposition, plaintiff reiterates arguments raised in motion for judgment on the pleadings, and he relies on statement of material facts, memorandum of law, and the following exhibits: 1) affidavit of plaintiff (attaching exhibits including correspondence), 2) defendants' amended answer and counterclaims, and 3) affidavit of defendant Bryant. Defendants replied in support of the motion.

## STATEMENT OF FACTS

---

[2]  In their motion to amend, defendants clarified that they only sought to amend their answer, not the counterclaims filed therewith. (See Def. Mem. (DE 31) ¶ 4). Thus, defendants asserted that amending their answer would not moot plaintiff's motion to dismiss counterclaims. See id. Plaintiff consented to defendants' motion. (Id. ¶ 5).

The court summarizes in turn below the facts alleged in plaintiff's amended complaint for background purposes, certain undisputed facts pertaining to the limited issue of top hat status, and the facts alleged in defendant HSM's counterclaims.

A.      Amended Complaint

Defendant HSM is a large furniture manufacturing company with principle place of business in Hickory, North Carolina.  (Am. Compl. (DE 6) ¶¶ 2, 17).  Plaintiff joined defendant HSM's board of directors in 2010, and on January 1, 2012, he became defendant HSM's president and chief executive officer.  (Id. ¶¶ 19, 22).  In addition, plaintiff joined defendant HSM's compensation committee, and he continued to serve on its board of directors.  (Id. ¶ 22).

Early in his tenure with defendant HSM, plaintiff sought reform of the compensation defendant HSM provided to its executives.  (Id. ¶ 24).  Accordingly, upon the recommendation of certain board members, plaintiff contacted Bob Donovan ("Donovan"), a financial advisor to defendant HSM.  (Id. ¶ 30).  Donovan suggested that defendant HSM implement retirement plans known as SERPs.  (Id. ¶¶ 32-33).  According to Donovan, if defendant HSM purchased life insurance policies on SERP recipients, the SERPs would be "cash neutral" to defendant HSM.  (Id. ¶¶ 34-35).

The compensation committee unanimously approved the SERP proposal, and on December 11, 2012, the defendant HSM's board of director's ratified the action of the compensation committee.  (Id. ¶¶ 48,61).  Plaintiff retired June 30, 2015, and received payments under his SERP through September 1, 2016.  (Id. ¶ 67).  However, on October 1, 2016, he received a letter from defendant HSM's outside council informing plaintiff that he was no longer entitled to receive benefits under his SERP.  (Id. ¶ 68).

B.      Undisputed Facts Pertinent to Summary Judgment

6

a.    The 2012 SERPs

In 2012, defendant HSM's compensation committee implemented ten SERPs.  (Pl. Opp. Stmt. (DE 45) ¶ 1; Defs. Stmt. (DE 41) ¶ 1).  Plaintiff "believed the 2012 SERP plan was intended to be a non-qualified unfunded employee benefit plan to provide retirement income to a select group of highly compensated employees, commonly known as a Top Hat Plan."  (Pl. Opp. Stmt. (DE 45) ¶ 24; Defs. Stmt. (DE 41) ¶ 24; Pl. Am. Compl. (DE 6) ¶ 53).  Likewise, defendant HSM intended the 2012 SERP to constitute a "top hat" plan.  (Pl. Opp. Stmt. (DE 45) ¶ 2; Defs. Stmt. (DE 41) ¶ 2).

b.    SERP Recipients

Eight of the 2012 SERP recipients were employees of defendant HSM, and they had the following job titles and salaries: 1) plaintiff was president and chief executive officer, and his salary was $761,194.53; 2) James Bush was senior executive vice president of wire production, and his salary was $221,738.31; 3) Hunter Lunsford was executive vice president and chief operating officer, and his salary was $287,035.36; 4) Wilbur Mann was senior vice president of foam operations, and his salary was $276,124.88; 5) James Packer was director of human resources, and his salary was $154,683.43; 6) Valerie Reid was assistant treasurer and director of finance, and her salary was $175,022.85; 7) defendant Underdown was vice president of purchasing, corporate secretary, and chairman of the board, and his salary was $231,720.50; and 8) Dwayne Welch was executive vice president and chief sales and marketing officer, and his salary was $348,529.15.  (Bryant Aff. (DE 35-2) ¶ 6; Def. Stmt. (DE 41) ¶ 10; Pl. Opp. Stmt. (DE 45) ¶ 10).

The above eight recipients were high-level management employees with supervisory responsibilities.  (Pl. Opp. Stmt. (DE 45) ¶ 9; Defs. Stmt. (DE 41) ¶ 9).  In addition, these recipients

were within the top 20% of the company's highest-compensated employees. (Pl. Opp. Stmt. (DE 45) ¶ 11; Defs. Stmt. (DE 41) ¶ 11). In fact, among defendant HSM's 477 salaried employees in 2012, the average salary for the 2012 SERP participants was $307,006.13, yet the average salary for nonparticipants was $61,359.80—a five to one disparity. (Pl. Opp. Stmt. (DE 45) ¶ 12; Defs. Stmt. (DE 41) ¶ 12).

The remaining two 2012 SERP recipients were former employees of defendant HSM. (Pl. Opp. Stmt. (DE 45) ¶ 1; Defs. Stmt. (DE 41) ¶ 13). Blake Trimble ("Trimble"), retired as defendant HSM's general counsel in June 2012, and during his final year of employment, his salary was $295, 679.17. (Pl. Opp. Stmt. (DE 45) ¶ 13; Defs. Stmt. (DE 41) ¶ 13). The other 2012 SERP recipient, Tom Pierce ("Pierce"), retired as chairman of defendant HSM's board on December 31, 2011, and previously retired as its vice president of finance in September 2003. (Pl. Opp. Stmt. (DE 45) ¶ 14; Defs. Stmt. (DE 41) ¶ 14). During his final year of employment with defendant HSM, Pierce's salary was $222,217.59. (Id.).

Plaintiff talked to both Trimble and Pierce and "had them sign" their 2012 SERPs. (Pl. Opp. Stmt. (DE 45) ¶ 17; Defs. Stmt. (DE 41) ¶ 17). A member of defendant compensation committee asked plaintiff "if the committee must approve Trimble and Pierce's agreements. [Plaintiff] said that he did not think so." (Pl. Opp. Stmt. (DE 45) ¶ 18; Defs. Stmt. (DE 41) ¶ 18). On January 17, 2013, plaintiff sent a letter to all 2012 SERP recipients, including Trimble and Pierce, congratulating them for being selected to receive a 2012 SERP. (Pl. Opp. Stmt. (DE 45) ¶ 23; Defs. Stmt. (DE 41) ¶ 23). The letter stated, "Your selection confirms your membership in my 'Core Management Group.'" (Id.; Underdown Aff. at Exhibit F).

    c.    Insurance Policies

8

Defendant HSM purchased insurance policies covering the lives of the 2012 SERP recipients. (Pl. Opp. Stmt. (DE 45) ¶¶ 4-5; Defs. Stmt. (DE 41) ¶¶ 4-5). The 2012 SERP did not designate the insurance policies as the source of plan funding. (Pl. Opp. Stmt. (DE 45) ¶ 5; Defs. Stmt. (DE 41) ¶ 5). Instead, the 2012 SERP indicated that payments to participants were to be made from the general funds of the company. (Id.). Specifically, section three of the 2012 SERP stated:

> The obligation of the Company to make payments hereunder shall constitute a liability of the Company to the Executive. Such payments shall be made from the general funds of the Company, and the Company shall not be required to establish or maintain any special or separate fund, or otherwise to segregate assets to assure that such payments shall be made, and the Executive shall not have any interest in any particular assets of the Company by reason of its obligations hereunder. Nothing contained in this Agreement shall create or be construed as creating a trust of any kind or any other fiduciary relationship between the Company and the Executive or any other person. To the extent that any person acquires a right to receive payment from the Company, such right shall not be greater than the right of an unsecured creditor of the Company.

(Am. Comp. Ex. 1 (DE 6)).

    d.    Rabbi Trusts

Defendant HSM created individual "rabbi trusts" to hold the proceeds of each insurance policy. (Pl. Opp. Stmt. (DE 45) ¶ 6; Defs. Stmt. (DE 41) ¶ 6). Each Rabbi Trust Agreement indicated that the 2012 SERP was to be an unfunded plan. (Pl. Opp. Stmt. (DE 45) ¶ 7; Defs. Stmt. (DE 41) ¶ 7). As relevant here, the trust agreements provided:

> it is the intention of the parties that this Trust shall constitute an unfunded arrangement and shall not affect the status of the Agreement as an unfunded plan maintained for the purpose of providing deferred compensation for a select management or highly compensated employee for purposes of Title I of the Employee Retirement Income Security Act of 1974.
>
> . . .
>
> beneficiaries shall have no preferred claim on, or any beneficial ownership interest in, any assets of the Trust. Any rights created under the Agreement and this Trust

Agreement shall be mere unsecured contractual rights . . . Any assets held by the Trust will be subject to the claims of the Company's general creditors.

(Underdown Aff. Ex. A (DE 42-1).

C.     Counterclaims

According to the counterclaims, plaintiff presented the proposed SERP program to defendant compensation committee on August 24, 2012. (Def. Am. Ans. (DE 34) ¶¶ 13-14). Under the program's terms, plaintiff would receive the largest amount, and defendant HSM would purchase the largest insurance policy on plaintiff's life. (Id. ¶ 11). Yet, plaintiff allegedly did not reveal his conflict of interest in proposing a plan that would disproportionately benefit himself. (Id. ¶ 14). Moreover, according to the counterclaims, Donovan did not disclose to defendant compensation committee the amount he would receive in commissions from the transaction as an insurance salesman. (Id. ¶ 22). Defendant compensation committee unanimously approved the 2012 SERP. (Id. ¶ 18).

In November 2012, Donovan gave plaintiff two notebooks containing insurance policy illustrations. (Id. ¶ 24). Although these illustrations did not match the insurance policies that were previously presented to defendant compensation committee, plaintiff did not share the illustrations with defendant compensation committee; instead, he placed them on a shelf in his office. (Id. ¶ 25). In addition, plaintiff did not permit or request analysis of the illustrations by defendant HSM's finance department. (Id. ¶ 27). If the illustrations had been analyzed, they allegedly would have disclosed that the "policies would lapse or would require significant additional cash outlays from HSM, and would not support the loans necessary to fund benefits as presented to the Committee." (Id. ¶ 28).

Defendant HSM's board of directors held a meeting December 11, 2012, to determine whether to approve the 2012 SERP as authorized by defendant compensation committee. (Id. ¶

32).  At the meeting, plaintiff allegedly did not disclose that his benefits under the 2012 SERP would be earned in a much shorter period of service than any other participant.  (Id. ¶ 33).  The board of directors approved the 2012 SERP, and thereafter, defendant HSM incurred substantial liabilities, as the SERP program was not cash-neutral.  (Id. ¶¶ 39-40).

The 2012 SERP transaction was allegedly inherently unfair to defendant HSM, especially as it related to plaintiff, since 1) plaintiff had only worked for defendant HSM for eight months when defendant compensation committee approved the 2012 SERP, 2) plaintiff voted for the approval of the 2012 SERP, 3) plaintiff was only required to work at defendant HSM for three to five years until he would be eligible to receive ten years of full benefits, and 4) due to plaintiff's age and proximity to retirement, defendant HSM could not build enough value in his life insurance policy prior to his retirement to fund his benefits under the 2012 SERP.  (Id. ¶¶ 41-45).

## DISCUSSION

A.    Standards of Review

1.    Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).  Only disputes

between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

2. Motion to Dismiss

12

"To survive a motion to dismiss" under Rule 12(b)(6), "'a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Factual allegations must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555. In evaluating whether a claim is stated, "[the] court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, . . . bare assertions devoid of further factual enhancement[,] . . . unwarranted inferences, unreasonable conclusions, or arguments." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009) (citations omitted).

B.     Analysis

1.     Top Hat Exemption

Plaintiff's motion for judgment on the pleadings and defendants' partial motion for summary judgment raise the issue of whether the 2012 SERPs qualify as "top hat" plans. A "top hat" plan is 1) "unfunded" and 2) "maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). ERISA exempts "top hat" plans from its fiduciary, participation, vesting, and funding provisions, but reporting and disclosure requirements still apply. See 29 U.S.C. §§ §§ 1021-1031, 1051(2), 1081(a)(3), and 1101(a)(1). Accordingly, defendants argue, and plaintiff denies, that the 2012 SERP qualifies as a top hat plan, and is therefore exempted from ERISA's fiduciary requirements. The court addresses the two statutory requirements for "top hat" plans in turn below.

13

a.      Unfunded

On the issue whether the 2012 SERP was "unfunded," the court notes that ERISA does not define this term, and the Fourth Circuit has not previously interpreted its meaning.  However, in Demery v. Extebank Deferred Comp. Plan (B), 216 F.3d 283, 285 (2d Cir. 2000), the Second Circuit addressed whether a plan was unfunded where: 1) the employer took out life insurance policies on its employees to help pay for its obligations under the plan and 2) the proceeds of the policies were kept in an account entitled Deferred Compensation Liability Account.

In Demery, the court first recited its previous holding that a plan is unfunded where "benefits thereunder will be paid solely from the general assets of the employer."  Id. (citing Gallione v. Flaherty, 70 F.3d 724, 725 (2d Cir. 1995)).  Then, the court adopted the following inquiry as instructive: "can the beneficiary establish, through the plan documents, a legal right any greater than that of an unsecured creditor to a specific set of funds from which the employer is, under the terms of the plan, obligated to pay the deferred compensation?"  Id. (quoting Miller v. Heller, 915 F. Supp. 651 (S.D.N.Y. 1996)).

Applying the above test, the court held that the plan was unfunded.  Id. at 287.  Of particular importance was the plan's express terms, which stated:

> [T]he Employer's obligation to make payments to any person under this Agreement is contractual and ... the parties do not intend that the amounts payable hereunder be held by the Employer in trust or as a segregated fund for the Employee. . . . The benefits provided under this Agreement shall be payable solely from the general assets of the Employer, and neither the Employee, the Beneficiary, nor any other person entitled to payments . . . shall have any interest in any specific assets of the Employer by virtue of this Agreement. Employer's obligation under the Plan shall be that of an unfunded and unsecured promise of Employer to pay money in the future.

14

Id. Based on those terms, the court concluded that the participants did not have a greater legal right to insurance proceeds than that of an unsecured creditor, thus the plan was unfunded as a matter of law. Id.

Other circuits addressing this issue have reached similar conclusions. See Reliable Home Health Care, Inc. v. Union Cent. Ins. Co., 295 F.3d 505, 514 (5th Cir. 2002) (holding that a plan was unfunded for purposes of ERISA, even though plan benefits were technically funded through an insurance policy, since plan participants did not own the insurance policies, and their only right under the plan was to designate death beneficiaries); Belsky v. First Nat. Life Ins. Co., 818 F.2d 661, 663 (8th Cir. 1987) (holding that a plan was unfunded where an employer "obtained the insurance policy with the intention that it could be used in funding the Plan" but "the language of the Plan . . . specifically avoids making a direct tie between the insurance policy and the Plan").

Here, as in Demery, Belsky, and Reliable Home Health Care, defendant HSM purchased life insurance policies on the recipients of an ERISA-governed plan, the 2012 SERP. The express terms of the 2012 SERP provided:

> The obligation of the Company to make payments hereunder shall constitute a liability of the Company to the Executive. Such payments shall be made from the general funds of the Company, and the Company shall not be required to establish or maintain any special or separate fund, or otherwise to segregate assets to assure that such payments shall be made, and the Executive shall not have any interest in any particular assets of the Company by reason of its obligations hereunder. Nothing contained in this Agreement shall create or be construed as creating a trust of any kind or any other fiduciary relationship between the Company and the Executive or any other person. To the extent that any person acquires a right to receive payment from the Company, such right shall not be greater than the right of an unsecured creditor of the Company.

(Am. Comp. Ex. 1 (DE 6)) (emphasis added). Mirroring the plan's terms in Demery, the above language makes clear that 2012 SERP benefits are paid out of defendant HSM's general funds, and 2012 SERP recipients' rights to those funds are no greater than those of an unsecured creditor.

Accordingly, under <u>Demery</u>, <u>Belsky</u>, and <u>Reliable Home Health Care</u>, the 2012 SERP was unfunded as a matter of law.

Plaintiff argues the 2012 SERP is funded because defendant HSM used insurance proceeds to pay benefits under the 2012 SERP and terminated the 2012 SERP when those proceeds became insufficient. However, the fact that defendant HSM used the life insurance proceeds to pay his benefits under the 2012 SERP does not establish that the 2012 SERP was a "funded" plan. Indeed, the employers in <u>Demery</u>, <u>Belsky</u>, and <u>Reliable Home Health Care</u> also used insurance proceeds to pay benefits, yet the court in those cases found the plans to be "unfunded" because the plan recipients did not have a right to the proceeds that was greater than that of an unsecured creditor. Likewise, here, the terms of the plan unequivocally establish that a 2012 SERP recipient's right to proceeds is not greater than that of an unsecured creditor, and defendant HSM's decision to terminate the 2012 SERP did not augment this right.

Finally, the fact that defendant HSM created individual rabbi trusts to hold the proceeds of each insurance policy does not alter the 2012 SERP's status as unfunded, where the trust documents indicated: 1) the trust did not affect the 2012 SERP's status as unfunded, 2) beneficiaries shall have no preferred claim to the trust assets, 3) the trust assets will be subject to creditors' claims in the event of insolvency. <u>See</u> <u>In re IT Group, Inc.</u>, 448 F.3d 661, 669-670 (3d Cir. 2006) (finding a plan to be unfunded where the related rabbi trust documents specified that the trust "shall not affect the status of the Plans as unfunded plans" and that "Trust assets are subject to creditors' claims in the event of insolvency, and that such claims are on par with those of Plan participants"); <u>see</u> <u>also</u> U.S. Dep't of Labor Opinion Letter 91-16A (July 2, 1991) ("[A] plan will not fail to be 'unfunded' . . . solely because there is maintained in connection with such plan a 'rabbi trust.'").

b. Select Group

Turning to the second statutory requirement, the court addresses whether the 2012 SERP was maintained by defendant HSM primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees. The Fourth Circuit has not addressed this requirement in a published opinion. However, in the unpublished opinion <u>Bond v. Marriott Intern., Inc.</u>, the Fourth Circuit explained that whether the group is "select" is determined by looking both qualitatively and quantitatively. 637 F. App'x 726 (2016) (citing <u>Demery</u>, 216 F.3d at 288). "[I]n number, the plan must cover relatively few employees. In character, the plan must cover only high level employees." <u>Id.</u> (citing <u>In re New Valley Corp</u>, 89 F.3d 143, 148 (3d Cir. 1996)).[3]

Here, regarding the quantitative factor, defendant HSM granted the 2012 SERP to less than 0.5% of its 2012 workforce of 3,245 employees. (<u>See</u> Def. Mem. (DE 36) at 14; Pl. Opp. Stmt. (DE 45) ¶ 11; Defs. Stmt. (DE 41) ¶ 11). Thus, the 2012 SERP program was numerically select. <u>See</u> <u>Demery</u>, 216 F.3d at 289 (holding that a plan offered to 15.34% of employees qualified as a top hat plan but stating that "this number [was] probably at or near the upper limit of the acceptable size for a 'select group'"); <u>Alexander v. Brigham and Women's Physicians Org.</u>, 513 F.3d 37, 44 (1st Cir. 2008) (finding plans maintained for 8.7% and 5.8% of employees to be "select."); <u>see also</u> <u>Guiragoss v. Khoury</u>, 444 F. Supp. 2d 649, 660 (E.D. Va. 2006) ("A review of the published cases reflects that there is no existing authority that affirms top hat status for a plan representing more than 16% of the total workforce.").

---

[3] Although the Fourth Circuit briefly discussed how to identify a "select" group, it ultimately determined the statute of limitations barred the appellants' ERISA claims; therefore, the Fourth Circuit never reached the question of whether the plan at issue was a "top hat" plan. <u>Bond</u>, 637 F. App'x at 733. Accordingly, the court must look to other circuits for guidance on this issue.

Regarding the qualitative factor, both parties agree that the eight 2012 SERP recipients employed by defendant HSM on the date they received their 2012 SERPs constitute "highly compensated employees" within the meaning of ERISA. (See Pl. Opp. Stmt. (DE 45) ¶ 9; Defs. Stmt. (DE 41) ¶ 9). However, plaintiff argues Trimble and Pierce do not qualify as "highly compensated employees" or management because they were <u>former</u> employees at the time their 2012 SERPs were granted. In support, plaintiff relies on the fact that ERISA defines an "employee" as "any individual employed by an employer." 29 U.S.C. § 1002(6). According to plaintiff, this definition is unambiguous and only encompasses current employees.

However, the Supreme Court's decision in <u>Robinson v. Shell Oil Co.</u>, 519 U.S. 337, 346 (1997) casts doubt on plaintiff's argument. In that case, the Court interpreted a nearly identical definition of "employee" in Title VII of the Civil Rights Act of 1964. <u>See</u> 42 U.S.C. § 2000e(f) ("The term 'employee' means an individual employed by an employer."). Importantly, the Supreme Court concluded that the word "employee" was ambiguous because, as here, the statute lacked "any temporal qualifier and is consistent with either current or past employment." <u>Robinson</u>, 519 U.S. at 342. Indeed, the court explained, "[t]hat the statute could have expressly included the phrase 'former employees' does not aid our inquiry. Congress also could have used the phrase '"current employees.'" <u>Id.</u> Then, the Court looked to "broader context of Title VII and the primary purpose of § 704(a)" and held the term "employee" encompasses former employees. <u>Id.</u> at 346.

Although not dispositive, the Supreme Court's holding in <u>Robinson</u>, suggests that the term "employee" under ERISA also encompasses former employees such as Trimble and Pierce.[4] <u>See</u>

---

[4]     In <u>Nationwide Mut. Ins. Co. v. Darden</u>, 503 U.S. 318, 319 (1992), the Supreme Court held that the term "employee" as it appears in ERISA incorporates traditional agency law criteria for determining whether a person is an employee or an independent contractor; however, the Court did not address whether the term "employee" encompasses former employees.

Kokoszka v. Belford, 417 U.S. at 642 ("When interpreting a statute, the court will not look merely to a particular clause in which general words may be used, but will take in connection with it the whole statute or statutes on the same subject . . ."); see also Serapion v. Martinez, 119 F.3d 982, 985 (1st Cir. 1997) ("We regard Title VII, ADEA, ERISA, and FLSA as standing in pari passu and endorse the practice of treating judicial precedents interpreting one such statute as instructive in decisions involving another.").

Reference to the definition of "highly compensated employee" in the Internal Revenue Code ("IRC") is also probative.  In Raymond B. Yates, M.D., P.C. Profit Sharing Plan v. Hendon, the Supreme Court applied the IRC definition of "highly compensated employee" to interpret the phrase's meaning in the top hat provision, noting that "Congress enacted ERISA against a backdrop of IRC provisions" and "Congress' objective was to harmonize ERISA with longstanding tax provisions."  541 U.S. 1, 12-14 (2004).  Although the Supreme Court was addressing a different component of the "highly compensated employee" definition in Hendon, its reliance on the IRC to interpret the phrase's meaning within ERISA's top hat provision is instructive.  As relevant here, the IRC provides "[a] former employee shall be treated as a highly compensated employee if—(A) such employee was a highly compensated employee when such employee separated from service."  I.R.C. § 414(q)(6)(A). [5]  Accordingly, this definition suggests Trimble and Pierce's status as former employees does not preclude a determination that they were "highly compensated employees."

---

[5]     The preamble to the proposed Section 414(q) regulations states that section 414(q) is not determinative with respect to any provision of Title I of ERISA because "a broad extension of section 414(q) to determinations under sections 201(2), 301(a)(3), and 401(a)(1) of ERISA would be inconsistent with the tax and retirement policy objectives of encouraging employers to maintain tax-qualified plans that provide meaningful benefits to rank-and-file employees. See 53 Fed. Reg. 4965-01.  However, as indicated below, Trimble and Pierce were not rank-and-file employees. Moreover, this preamble predates the Supreme Court's decision in Hendon.

Plaintiff argues, however, that Trimble and Pierce cannot qualify as "highly compensated employees" because "it is impossible to provide deferred compensation, which is compensation earned today the payment of which is deferred to sometime in the future, to someone who is not currently employed." (Pl. Resp. (DE 44) at 7).[6] However, the Ninth Circuit's decision in Duggan v. Hobbs, 99 F.3d 307 (9th Cir. 1996) forecloses plaintiff's argument. In Duggan, the court concluded that the fact the employee entered into the ERISA-governed plan after performing some of the services he was being compensated for "does not change our view that the Agreement provides for deferred compensation. The compensation was deferred because [the employee] did not receive it until well after he rendered most of the services for which he was being compensated." 99 F.3d at 311. In reaching that conclusion, the court referred to, among other authorities, a treatise which provided "[d]eferred compensation arrangements are generally established either before or at the time of the performance of service to which the compensation relates. Certain arrangements, especially those that provide supplemental retirement income benefits, can be adopted after the service has been rendered." Id. (quoting Andrew J. Lawlor and Jeffrey Perlmuter, "Nonqualified Deferred Compensation for Key Executives," in Employee Benefits Handbook, § 14.01 (Jeffrey D. Mamorsky ed., 3rd ed. 1991). In light of Duggan and the authorities cited therein, the fact Trimble and Pierce received 2012 SERPs after they provided services to defendant HSM is immaterial to the court's present inquiry.

The court next considers whether the top hat exemption's purpose supports the classification of Trimble and Pierce as "highly compensated employees." Review of the relevant authorities reveals Congress intended to carve out the top hat exemption because "high-echelon

---

[6] Page numbers in citations to documents in the record specify the page number designated by the court's electronic case filing (ECF) system, and not the page number, if any, showing on the face of the underlying document.

employees, unlike their rank-and-file counterparts, are capable of protecting their own pension interests." Alexander, 513 F.3d at 43 (internal citations omitted); see also Fed. Reg. 34530 ("[C]lass of employees with respect to whom [top hat compliance exemptions] appl[y]—highly compensated or management employees—generally have ready access to information concerning their rights and obligations and do not need the protections afforded them by Part 1 of Title I of the Act.").

With that purpose in mind, the court evaluates Trimble and Pierce's respective positions and compensation levels. As Trimble and Pierce's salaries were more than twice the average salary of the employees who did not participate in the 2012 SERP,[7] they were highly compensated. See Alexander, 513 F.3d at 37 ("[T]he employer must be able to show a substantial disparity between the compensation paid to members of the top-hat group and the compensation paid to all other workers."); Demery, 216 F.3d at 289 (finding participants to be highly compensated where the average salary of plan participants was more than double that of the average salary of all of the company's employees). Moreover, by holding positions such as chairman of the board of directors, general counsel, and vice president of finance, Trimble and Pierce were high-echelon, rather than rank-and-file employees. Cf. Guiragoss, 444 F. Supp. 2d at 663 (finding that a salesclerk is not a high-ranking employee); U.S. Dep't of Labor Opinion Letter 85-37A (Oct. 28, 1985) (plan offered to foremen, an assistant in the cost department, an order department clerk, and an expediter among others, did not qualify as a top hat plan).

As high-ranking employees, they had access to information concerning their rights and obligations, so they did not need the extra protections afforded by ERISA. See Fed. Reg. 34530

---

[7] During their final years of employment, Trimble's salary was $295,679.17, and Pierce's salary was $222,217.59. (Pl. Opp. Stmt. (DE 45) ¶¶ 13-14; Defs. Stmt. (DE 41) ¶¶ 13-14). The average salary of nonparticipants was $61,395.80. (Defs. Stmt. (DE 41) ¶ 12); Pl. Opp. Stmt. (DE 45) ¶ 12).

("[C]lass of employees with respect to whom [top hat compliance exemptions] appl[y]—highly compensated or management employees—generally have ready access to information concerning their rights and obligations and do not need the protections afforded them by Part 1 of Title I of the Act."). Although Trimble retired as general counsel in June 2012, and Pierce retired as chairman of the board of directors on December 31, 2011, their retirement did not erase their institutional knowledge regarding their rights and obligations, especially in light of the limited amount of time that elapsed between the dates of their retirement and the grant of their 2012 SERPs. Accordingly, consideration of the top hat exemption's purpose supports inclusion of Trimble and Pierce in the category of "highly compensated employees."

Finally, it bears noting that plaintiff concedes the 2012 SERP was intended to be a top hat plan (Pl. Opp. Stmt. (DE 45) ¶ 24; Defs. Stmt. (DE 41) ¶ 24; Pl. Am. Compl. (DE 6) ¶ 53) and that he was a "highly compensated employee." (Pl. Opp. Stmt. (DE 45) ¶¶ 8-9; Defs. Stmt. (DE 41) ¶¶ 8-9). Indeed, he was president and chief executive officer of defendant HSM, he served on defendant HSM's board of directors and on defendant compensation committee, and he received a salary of $761,194.53. (Pl. Opp. Stmt. (DE 45) ¶ 10; Defs. Stmt. (DE 41) ¶ 10; Am. Compl. (DE 6) at 1). He was also involved in the implementation of the 2012 SERP—plaintiff asked Donovan to put together a SERP proposal for plaintiff to review (Pl. Aff. (DE 46-1) ¶ 4), and plaintiff told defendant compensation committee that he did not think it needed to approve Trimble and Pierce's SERP agreements (Pl. Opp. Stmt. (DE 45) ¶ 18; Defs. Stmt. (DE 41) ¶ 18). In light of the above, plaintiff possessed significant bargaining power and influenced the terms of the 2012 SERP, which is consistent with the purpose of the top hat exemption.

In sum, in consideration of the Supreme Court's holding in Robinson, the definition of "highly compensated employee" in the IRC, the top hat exemption's purpose, and Trimble and

Pierce's respective positions and compensation levels, the court finds in this instance that Trimble and Pierce's inclusion in the 2012 SERP program does not abrogate the 2012 SERP's status as a top hat plan. As such, ERISA exempts the 2012 SERP from its fiduciary provisions, see 29 U.S.C. §§ 1051(2); 1081(a)(3); and 1101(a)(1), and plaintiff's second and third claims for relief for breach of fiduciary duty fail as a matter of law. Given the court's resolution of the issue of top hat status, defendants' partial motion for summary judgment is granted in this part, and plaintiff's motion for judgment on the pleadings is denied.

2.    ERISA Preemption

In defendants' motion for partial summary judgment, defendants argue ERISA preempts plaintiff's claim for unpaid wages under the NCWHA. Additionally, in the instant motion to dismiss, plaintiff argues ERISA preempts defendant HSM's counterclaims for rescission and constructive fraud.

Section 514 explicitly provides that ERISA preempts all laws that "relate to" an employee benefit plan. 29 U.S.C. § 1144(a); see Shaw v. Delta Airlines, 463 U.S. 85, 96 (1983). Although previously the Supreme Court defined the scope of § 514 preemption as "deliberately expansive," Pilot Life Ins. Co v. Dedeaux, 481 U.S. 41, 46 (1987), more recently the Court noted that it had "to recognize that our prior attempt to construe the phrase 'relate to' does not give us much help drawing the line" for preemption. N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655–56 (1995). Accordingly, the Court explained that it was necessary to "go beyond the unhelpful text and the frustrating difficulty of defining [§ 514's] key term and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." Id. at 656. Upon consideration of those objectives, the Court held

"[t]he basic thrust of [ERISA's] preemption clause . . . was to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." Id. at 657.

In light of this guiding principle, "the Supreme Court has explained that Congress intended ERISA to preempt at least three categories of state law: (1) laws that mandate[] employee benefits structures or their administration; (2) laws that bind employers or plan administrators to particular choices or preclude uniform administrative practice; and (3) laws providing alternate enforcement mechanisms for employees to obtain ERISA plan benefits.'" Great-West Life & Annuity Ins. Co. v. Info. Sys. & Networks Corp., 523 F.3d 266, 270 (4th Cir. 2008) (quoting Wilmington Shipping, 496 F.3d at 342) (emphasis in the original).

According to the United States Court of Appeals for the Fourth Circuit, "[a] key feature of these categories of laws is that they implicate the relations among the traditional ERISA plan entities" contrasted to "state actions [that] may affect employee benefit plans in too tenuous, remote, or peripheral a manner," such as "run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan." Id. (quoting Wilmington Shipping, 496 F.3d at 342; Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 100 n.21 (1983); Mackey v. Lanier Collection Agency & Svc., Inc., 486 U.S. 825, 833 (1988)).

a.      Defendant HSM's Counterclaims

Here, defendant HSM asserts counterclaims for 1) rescission of the 2012 SERP and recoupment of benefits paid to plaintiff under the 2012 SERP, on grounds that plaintiff's conflict of interest rendered the 2012 SERP voidable at defendant HSM's election and 2) constructive fraud, on grounds that plaintiff's involvement in the implementation of the 2012 SERP constituted a breach of his fiduciary duty to defendant HSM.  (Counterclaims (DE 34) ¶¶ 53-62).  Plaintiff argues these counterclaims "relate to" the 2012 SERP and are thus preempted by ERISA.

As an initial matter, the court notes that the Fourth Circuit has not addressed the preemption issue directly before the court. However, the Sixth Circuit's decision in <u>Davies v. Centennial Life Ins. Co.</u>, 128 F.3d 934 (6th Cir. 1997) is instructive. In <u>Davies</u>, plaintiffs alleged defendants violated ERISA § 502 by denying a claim for benefits under a group health policy, and defendants filed counterclaim, seeking rescission of the health policy under an Ohio statute. 128 F.3d at 938. Defendants argued ERISA did not preempt their counterclaim because it was based on alleged misrepresentations plaintiff made before the parties formed the ERISA-governed plan. On appeal, the Sixth Circuit rejected defendants' argument by stating:

> state law claims for rescission of an ERISA plan and for restitution based on fraud and misrepresentation occurring before the ERISA plan existed are not preempted, <u>the claims not being for plan benefits or an increase in plan benefits</u>. In the present case, however, plaintiffs' claim is for plan benefits; it is defendants' claim for rescission that is not. Because defendants' claim is essentially an affirmative defense, it is inextricably interwoven with plaintiff's claim for benefits. Resolution of defendants' claim for rescission requires an interpretation of the terms and conditions of [plaintiff's] health insurance contract, a contract that is part of the ERISA-governed plan under which she seeks benefits.

<u>Id.</u> at 940 (emphasis in original). The court went on to state that since "defendants are simply attempting to deny benefits under the plan . . . [their counterclaim] 'relates to' an employee benefits plan governed by ERISA." <u>Id.</u>

Here, as in <u>Davies</u>, plaintiff asserts a claim for denial of benefits in violation of ERISA § 502, and defendant HSM asserts counterclaims for rescission of an ERISA-governed plan, the 2012 SERP, based on alleged fraud and other conduct that occurred prior to the enactment of the plan. Thus, under <u>Davies</u>, plaintiff's claim for benefits under ERISA and defendant HSM's counterclaims are "inextricably interwoven." 128 F.3d at 940.

Their interrelatedness is further elucidated by the possibility of inconsistent judgments if defendant HSM prevails on its counterclaims and recoups benefits previously paid to plaintiff

25

under the 2012 SERP, and plaintiff prevails on his ERISA claims. In that event, the law governing the 2012 SERP would be conflicted, impeding ERISA's main objective of "uniform administration of employee benefit plans." Travelers, 514 U.S. at 657; see also Shepherd v. Cmty First Bank, No 8:15-04337-MGL, 2017 WL 5004456, at *4 (D.S.C. Nov. 1, 2017) ("[I]f Defendants were to prevail on their claims and to recover Plan payments they made to Plaintiff as damages, and Plaintiff were to prevail on his ERISA claims, an inconsistent judgment would result, and there would be a conflict in the law governing the Plan. Such a result is contrary to the objectives of ERISA preemption of developing a uniform body of benefits law.").

Finally, as in Davies, resolution of defendants' counterclaims will require an evaluation of the terms of the 2012 SERP. In its counterclaims, defendant HSM asserts plaintiff breached his fiduciary duty to defendant HSM by falsely representing that the 2012 SERP would be a cash-neutral program. (See Counterclaim (DE 34) ¶¶ 40-41). Logically, evaluation of the merits of this claim will involve scrutiny of the 2012 SERP's terms to determine if it is in fact a cash-neutral program. Therefore, ERISA preempts defendant HSM's counterclaims.

Cases cited by defendant HSM are distinguishable. For example, in Trs. of the AFTRA Health Fund v. Biondi, 303 F.2d 765 (7th Cir. 2002), trustees of an ERISA-governed health fund brought a claim for common law fraud against one of the fund's participants, alleging the participant failed to notify the fund of his divorce, causing the fund to continue to provide his ex-wife with benefits. Although the Seventh Circuit ultimately held that ERISA did not preempt the state law claim for fraud, Biondi is distinguishable because it did not involve a claim for benefits under the fund by the participant. See Davies, 128 F.3d at 940 (emphasis in original) ("[S]tate law claims for rescission of an ERISA plan and for restitution based on fraud and misrepresentation occurring before the ERISA plan existed are not preempted, the claims not being for plan benefits

or an increase in plan benefits."). Thus, it could not be said that the state law claim for fraud was "inextricably interwoven" with a claim for benefits under an ERISA-governed plan. Id.

Boston Children's Heart Found., v. Nadal-Ginard, 73 F.3d 429 (1st Cir. 1996) also cited by defendant, is distinguishable as well, where that case did not involve a claim for plan benefits either. Instead, in that case, a corporation filed complaint against a member of its board of directors, alleging among other claims, that the board member breached his fiduciary duty while implementing a severance benefit plan governed by ERISA. Nadal-Ginard, 73 F.3d at 438. Although Nadal-Gindard is admittedly closer to the instant case than Biondi, it did not involve a claim for benefits or increase in benefits by the board member, making it distinguishable on grounds articulated by the Sixth Circuit in Davies.

In sum, ERISA "relates to" and thus preempts defendant HSM's counterclaims for rescission and constructive fraud. Accordingly, defendant HSM's counterclaims are dismissed with prejudice.[8]

> b.   Plaintiff's NCWHA Claim

In plaintiff's fourth claim for relief, plaintiff seeks unpaid wages owed to him under the 2012 SERP, pursuant to NCWHA. Defendants argue that ERISA preempts this claim.[9]

In a similar case, the Fourth Circuit held that a NCWHA claim for benefits under an ERISA-governed severance plan "relates to" an employment benefit plan and is therefore preempted by ERISA. See Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1147 (4th Cir. 1985) ("[W]e have no trouble concluding that the state actions at issue are preempted. The state law here

---

[8]     Where all claims asserted against plaintiff have been dismissed, plaintiff is directed to show cause within 14 days of the date of this order why his cross claim for contribution and his claim for indemnification should not dismissed as moot.

[9]     Plaintiff did not address this argument in his response in opposition to the instant motion. (See Pl. Resp. (DE 44)).

essentially requires employers to pay wages due upon termination of employment, N.C. Gen. Stat. § 95–25.7. Insofar as this statute is invoked in pursuit of benefits allegedly due under Burlington's severance pay plan, it "relates to" an employee benefit plan covered by ERISA."). In accordance with Holland, plaintiff's NCWHA claim for benefits allegedly owed under the 2012 SERP "relates to" an employment benefit plan and therefore preempted by ERISA. Accordingly, the court grants defendants' motion for partial summary judgment in this part and dismisses plaintiff's claim with prejudice.

## CONCLUSION

Based on the foregoing, the court ORDERS the following:

1) Plaintiff's motion to dismiss defendant HSM's counterclaims (DE 24) and defendants' motion for partial summary judgment (DE 35) are GRANTED, and plaintiff's motion for judgment on the pleadings (DE 37) is DENIED. Defendant HSM's counterclaims for rescission and constructive fraud are DISMISSED WITH PREJUDICE. Plaintiff's second, third, and fourth claims for relief are DISMISSED WITH PREJUDICE.

2) Where all claims asserted against plaintiff have been dismissed, plaintiff is DIRECTED to show cause within 14 days of the date of this order why his cross claim for contribution and his claim for indemnification should not be DISMISSED WITHOUT PREJUDICE AS MOOT.

3) Plaintiff's claim for improper denial of benefits in violation of ERISA § 502(a)(1) is ALLOWED to proceed.

4) The court LIFTS stay on pending case activities.

5) Where the court entered initial scheduling order June 24, 2019, the parties are DIRECTED to file joint report and plan, as described in the court's initial scheduling order, proposing

28

discovery limitations and deadlines pertaining to plaintiff's remaining claim, not later than 14 days after the date of this order. Thereupon the court will enter such further order as is warranted regarding scheduling.

SO ORDERED, this the 24th day of March, 2020.

LOUISE W. FLANAGAN
United States District Judge